

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00705-CR

Nathaniel Armed **MELENDEZ**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2022CR9252
Honorable Ron Rangel, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:    Irene Rios, Justice
Lori Massey Brissette, Justice
Adrian A. Spears II, Justice

Delivered and Filed: April 22, 2026

AFFIRMED

In three issues, appellant Nathanial Armed Melendez, Jr. appeals his murder conviction. Specifically, Melendez challenges the sufficiency of the evidence to support his conviction, contends he received ineffective assistance of counsel, and argues the State made an improper closing argument. We affirm the trial court's judgment of conviction.

## BACKGROUND

In 2022, Melendez and his friend went to a small Fourth of July party at an apartment. They both carried guns to this party. At some point, Melendez shot his handgun, firing ten rounds toward people at the party. Three people were shot during the incident; one person, Evelyn Gumbardo, died.

Subsequently, the State indicted and tried Melendez for murder, the jury found Melendez guilty of committing murder, and the trial court sentenced him to seventy years in prison. Melendez appeals.

## LEGAL SUFFICIENCY

We first address Melendez's challenge to the sufficiency of the evidence to support his conviction because it is a rendition issue and thus, its resolution could be dispositive. Melendez only challenges the sufficiency of the evidence as it pertains to his culpability, arguing the evidence is insufficient to prove he acted intentionally or knowingly when he shot and killed Evelyn.

### A. Standard of Review and Applicable Law

When reviewing the sufficiency of the evidence, we determine whether, "'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Witcher v. State*, 638 S.W.3d 707, 709–10 (Tex. Crim. App. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

This standard coincides with the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The factfinder may and should draw "reasonable inferences" from the

evidence but may not draw conclusions based on "mere speculation." *Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007).

The factfinder alone judges the evidence's weight and credibility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). We must presume the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See id*.; *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (reviewing court must not sit as thirteenth juror). "Although the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the [factfinder]'s choice between them cannot be clearly erroneous." *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (internal quotations omitted).

Under the Penal Code and relevant to the facts of this case, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2). To establish the requisite culpability in finding someone guilty of murder, the State must prove the defendant had a "conscious objective or desire" to cause the death or an awareness that the "conduct is reasonably certain to cause" the death. *See id*. § 6.03(a), (b); *see also id*. § 19.02(b)(1), (2).

*B. Applicable Facts*

The State presented seventeen witnesses. However, Melendez's sufficiency complaint only challenges the evidence pertaining to the requisite culpable mental state necessary for the jury to find him guilty of committing murder. Thus, we only discuss facts applicable to this issue.

Catalina, who suffered severe injuries after being shot four to six times, testified about the shooting at the apartment where she lived. She, Evelyn, Catalina's aunt Cortney, and her aunt's boyfriend lived together in the two-story apartment. Catalina, Evelyn, Evelyn's boyfriend, Joseph, and Cortney decided to celebrate the Fourth of July at the apartment by hosting a small party. Originally, seven other people were invited to the party: Carlos, Jesse, Daniel, Celeste, Laila, Clarissa, and Clarissa's boyfriend Alonzo ("Juice"). Catalina admitted they were drinking and intoxicated, and Catalina stated she smoked marijuana. Clarissa asked Catalina if she could invite two of her friends that Catalina did not know, Melendez and Robert Keys. Catalina allowed Clarissa to invite them.

Melendez and Keys arrived at the apartment about two hours before the shooting. According to Catalina, she did not notice Melendez's gun when he arrived but did see Keys carrying what appeared to be an automatic rifle, which did not initially alarm Catalina because she was commonly around people who carried guns. Catalina explained that as the party progressed, Celeste, Laila, Clarissa, Juice, and Keys went upstairs, leaving Catalina, Evelyn, Cortney, Joseph, Carlos, Jesse, Daniel, and Melendez downstairs. Catalina recalled that Cortney was in the bathroom, and Joseph, Carlos, Jesse, and Daniel (sometimes collectively referred to as "the males"), were in the kitchen, while Catalina and Evelyn sat in the living room in chairs near the front door discussing whether they should end the party. The front door to the apartment and where Catalina and Evelyn sat was located on the opposite side of the kitchen. The back door was by the

kitchen and the door that everyone primarily used. Melendez was also near the front door at the base of the stairs close to where Catalina and Evelyn were sitting. Just before the shooting began, Catalina testified that Evelyn, while still sitting on the chair in the living room, directed Catalina's attention to Melendez holding a gun in both his hands. Catalina stated that Melendez was clutching the gun and pointing it downwards when she approached him to ask if he was okay. Catalina added that Melendez appeared mad and was glaring at the males in the kitchen, who were not paying attention to him. Upon Catalina asking Melendez what was wrong and if he was okay, Melendez pointed the gun at Catalina and told her to "back the f--- up." Catalina recalled grabbing Evelyn to try and go underneath a table located in the middle of the living room. Catalina did not believe Melendez was going to shoot her and Evelyn. Rather, she thought he was going to shoot the males in the kitchen.

Once Catalina was shot, she did not recall everything that happened other than Melendez fleeing through the front door of the apartment and the people upstairs coming down and leaving as well. Carlos grabbed Evelyn to rush her to the hospital, but he could not find car keys. Evelyn was laid down on the back porch outside the apartment. Catalina testified she was initially able to stand and tried running out the back door for help but when she saw Evelyn, she lay down near her. Daniel, who died prior to trial from an unrelated incident, was also shot in the leg during the shooting but was taken to the hospital before the police arrived.

Catalina testified that prior to the shooting, she did not recall Melendez socializing with other people at the party. She did recall, however, Melendez having his hands in his pants on the gun multiple times prior to the shooting. At no time did Catalina see or hear any of the males in the kitchen threaten Melendez, and neither she nor Evelyn threatened him. According to Catalina, she had no idea what made Melendez begin shooting.

While investigating the shooting, the police only located three other people who were at the party; and only two witnesses' testimony was relevant. Celeste recalled that Melendez and Keys were both carrying weapons. According to Celeste, Melendez introduced himself to everyone when he arrived at the party, but she did not talk to him the remainder of the night and did not notice anything wrong with him. Celeste claimed she saw Melendez and Keys drinking and smoking marijuana although Melendez claimed he did not drink alcohol and his vape contained nicotine, not marijuana. Celeste was upstairs when she heard the gunshots downstairs.

Jesse testified he stayed in the kitchen area with Carlos and Daniel during the party, and he did not really recall anything about Melendez until the shooting occurred. As soon as the shooting ended, Jesse's brother picked him up and they went to the hospital to see Daniel. Jesse stated that neither he nor Carlos nor Daniel did anything to provoke Melendez and that he was shocked when the shots began.

Several San Antonio Police Department officers and detectives testified regarding their investigation of the shooting. San Antonio Police Officer Marcus Nevarez testified that earlier in the evening of the shooting he was called to the apartment after police received a noise disturbance complaint. According to Officer Nevarez, he spoke with three individuals, made sure an adult was present at the party, and advised them to make good decisions. Because no criminal offense was committed, Officer Nevarez had no reason to go inside the apartment. It was not until Officer Nevarez arrived at the scene of the shooting that he realized it was the same apartment he had responded to previously, recognizing Evelyn and Catalina as two of the people he spoke with earlier. He saw they had been shot and appeared to have life-threatening injuries. Officer Nevarez arrested Melendez after he was detained at a nearby apartment complex and brought to the Department's homicide unit. The interactions between Officer Nevarez and Melendez were

recorded on Officer Nevarez's body camera, and the footage was admitted into evidence and played for the jury.

San Antonio Police Officer Luis Rodriguez-Leal testified that he responded to a call to a nearby apartment complex about a man, later identified as Melendez, who threw his gun into a woman's apartment. Officer Rodriguez detained Melendez and retrieved the gun. The interactions between Officer Rodriguez and Melendez were recorded by Officer Rodriguez's body camera, and the recording was admitted into evidence. The recording shows Melendez thanking the officer for coming to save his life and stating someone was trying to kill him. Officer Rodriguez described Melendez as acting paranoid. San Antonio Police Officer Cassandra Serna also responded to the nearby apartment complex and assisted Officer Rodriguez with Melendez and with retrieving the gun. She described Melendez as acting abnormally and appearing to be under the influence of something. Officer Serna testified that Melendez was sweating a lot and appeared out of breath and very anxious.

The woman whose apartment Melendez threw his gun into testified that Melendez knocked on her door in the early morning hours, woke her up, and asked her to call his mother. The woman described Melendez as breathing very hard and out of breath, he was sweaty and acting erratic or in a manic state. Melendez told her that someone was trying to get him and that he did not do it. Melendez also told her that there had been an accident and that someone was saying he killed someone and trying to set him up.

San Antonio Police Detective Crystal Ferguson conducted Melendez's interview after being arrested. Detective Ferguson described Melendez as "very paranoid" and under the influence of a substance. EMS checked Melendez, and his vitals were normal. Melendez explained to Detective Ferguson that during the party, he "felt someone was coming at him or that people were

trying to get him" but he could not articulate exactly what the threat was other than people kept smiling at him and asking him if he was okay. Detective Ferguson concluded, however, that the evidence from the scene—including evidence showing Evelyn and Catalina were both shot in the back—did not suggest anyone directed an attack toward Melendez. Following the interview, Detective Ferguson told Melendez that he was being charged and going to jail. Melendez then became "very upset" and began stating that the police were not listening to him about being attacked. Even after being told Evelyn died, Melendez responded that he really did not care.

Melendez testified in his own defense. He explained that he did not want to go to the party because he has "bad anxiety and paranoia" and being around too many people, strange people, or strange places "sets him off." Both he and Keys took ecstasy before they went to the party, and Melendez acknowledged that they took guns to the party. Melendez stated he did not know why they took the guns and that neither of them planned to use them, but that it was common for younger people to have guns. Melendez claimed that the gun he was carrying was not visible to others and that he did not see anyone else with a gun other than Keys. Other than Keys, the only other person Melendez knew at the party was Joseph, who Melendez had spent time with while in juvenile custody.

According to Melendez, he wanted to leave the party, but Keys convinced him to stay. Melendez stated he isolated himself from everyone and looked at his phone primarily, only talking to people when they talked to him and sharing his vape pen when asked. Melendez denied having any conflict with anyone at the party but claimed "they had a problem" with him, adding that Joseph slapped his hand when he tried to shake his hand, recalling that they had an altercation while in juvenile custody. Melendez also claimed that toward the end of the party, Carlos, Daniel, and Jesse came and sat near him and Keys, and after quickly drinking some alcohol stood up

holding "these long shish kabob things[.]" When Melendez tried to draw Keys's attention to them, Melendez said Keys ignored him. Stating that he understood some Spanish words and could piece them together, Melendez testified that it sounded like Carlos, Daniel, and Jesse were talking about him in Spanish. Specifically, Melendez testified that he thought they were saying they were going to get him or get something, and they were looking at him.

Melendez testified that he was aware of everything that was going on and that he was watching everyone. Melendez explained that he did not drink alcohol but everyone else at the party was drinking, and the more they drank "the more adamant they became, the more, you know, reckless with the way they were talking, the way they were looking, their body language, you know." According to Melendez, Keys was summoned to the kitchen by the males. While Keys talked to them, Melendez claimed the males were looking at him, and he saw one of them reach for Keys's gun. Melendez tried to warn Keys, and when Keys did not hear him, Melendez claimed he approached Keys and asked, "[I]s this a set up?" to which Keys told Melendez he needed to handle his own business as he walked away and went upstairs.

Melendez testified that at that point he began walking away from the kitchen area, but the males began to move toward him, so he brandished his gun to keep them back. Melendez claimed that the males did not appear to be scared and continued coming toward him as he headed for the front door of the apartment. Melendez guessed that because he did not exhibit threatening behavior during the party, they did not think Melendez would hurt them. Before he reached the door, Melendez said Catalina began to approach him and despite him pointing the gun at her and telling her to get back while he attempted to unlock the front door, she continued her approach. Melendez recalled that he once again pointed the gun toward Catalina, told her again to get back, and then

began shooting. Melendez testified that he was not aiming at anyone and began shooting because he was scared and just wanted to leave.

While Melendez testified that he did not intend to shoot anyone, he admitted firing his gun into a crowd could result in someone getting shot, injured, or killed. Despite that understanding, Melendez stated he still fired his gun because he feared they would get him and kill him. Melendez additionally claimed that because he had never shot a gun before that night, he did not know how many shots he fired. His focus was to make the people at the party back up so he could leave.

Although Detective Ferguson could not locate any attempts by Melendez to contact 911, Melendez claimed he called 911 twice to ask for help. With respect to his reaction when Detective Ferguson told him he was going to jail, Melendez explained that the he did not understand why because he felt he did nothing wrong, and it was the males at the party that were coming toward him when he just wanted to leave. Melendez further expressed his remorse for shooting and killing Evelyn. Melendez explained that during his interview when he said he did not care someone died, he was reacting to the overall situation and in disbelief about what happened when he just wanted to leave the party.

During the State's cross-examination, Melendez's only explanation for carrying Keys's gun to the party despite knowing guns are dangerous, especially when considering Melendez's anxiety, was that he did not think anything would happen at the party. Melendez also claimed he was not worried about carrying the gun because he was not the type of person who would use it. However, when asked about firing ten rounds into a crowd of people, killing Evelyn, seriously injuring Catalina, and shooting Daniel in the leg, Melendez said he was "[s]cared they were gonna hurt" him. Although Catalina was the only person who walked up to him, Melendez continued to claim the males were also coming toward him, and he did not know if Catalina was part of what

Melendez termed a "conspiracy" as well. With respect to what he considered physical threats, Melendez testified that the males "started to get amped up" by "drinking down liquor" and "brandished" or pointed the "long shish kabob thing[s]" at him. For the first time, Melendez also claimed Catalina tried grabbing the gun from him when she approached him. Melendez claimed he "didn't have [his] mind together" to tell Detective Ferguson during his interview about Catalina's attempt to grab the gun. According to Melendez, had Catalina not approached him he would not have fired the gun. Melendez added that he felt threatened by the "whole situation," leading him to fire the gun.

Melendez explained that his family had told him he has always suffered from anxiety and paranoia. Melendez claimed he took ecstasy despite his anxiety because he thought he would only be around Keys. Additionally, Melendez explained that his vape only contained nicotine, and nicotine helped him with his anxiety. When questioned why he did not just leave the party, Melendez explained the door was secured with two locks and a chain commonly used on the inside of residential doors. And although Melendez claimed no one reacted in fear when he brandished his gun, Melendez stated he began shooting because he was scared and "they approached me." Melendez maintained that when he began shooting, his intent was to get people away from him, not to shoot anyone. But Melendez also agreed that when someone is standing as close as Catalina was and a gun is fired, a bullet is likely to hit that person. Despite telling the officers and initially testifying that he felt he did nothing wrong, Melendez acknowledged his responsibility in firing the gun and agreed with the State's question that he no longer felt that he had done anything wrong.

Upon being questioned on redirect examination, Melendez testified that he was not claiming he acted in self-defense; rather, he took responsibility for firing the gun that caused Evelyn's death. Melendez again added that while he did not intend to harm anyone, he was aware

that firing a gun into a group of people could cause harm or injury. He maintained, however, that Catalina attempted to grab the gun, first adding that she had her hands around the gun but later retracting this claim on cross-examination. Melendez stated he had the gun pointed toward her and was not going to let her take the gun, so he began shooting.

## C. Analysis

Melendez does not dispute that he shot the gun multiple times toward the people in the apartment and that Evelyn died from a fatal shot. Rather, at trial and on appeal, Melendez maintains he did not intend to cause Evelyn's death, and thereby, the State failed to prove the intentional or knowing culpable mental state necessary for the jury to find him guilty of committing murder.

"By its nature, a culpable mental state must generally be inferred from the circumstances." *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). "We cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words[,] and conduct." *Id*. In doing so, "the factfinder may consider the defendant's conduct and surrounding circumstances and events in deciding the issue of intent." *Lee v. State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.). In evaluating the sufficiency of the evidence to show the defendant's intent, and faced with a record that supports conflicting inferences, we presume the factfinder resolved any conflict in favor of the verdict it rendered, and we defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

The specific intent to kill may be inferred from the use of a deadly weapon unless it is reasonably apparent that death or serious bodily injury could not result from the manner of use. *See Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986) ("If a deadly weapon is used in [a] deadly manner, the inference is almost conclusive that he intended to kill[.]"); *see also Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). A firearm is a "deadly weapon"

under the Texas Penal Code. TEX. PENAL CODE ANN. § 1.07(a)(17)(A). Furthermore, to establish the evidence supports the defendant committed murder knowingly, the evidence must lead to a rational conclusion that the defendant was aware that his conduct was reasonably certain to result in death. *See Medina v. State*, 7 S.W.3d 633, 636–37 (Tex. Crim. App. 1999) (finding legally sufficient evidence of intent to kill despite appellant only intended to shoot at the house not specifically at any individual); *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (("The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon.") (citations omitted)). "[I]t is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, . . . and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Balderas v. State*, 517 S.W.3d 756, 766–67 (Tex. Crim. App. 2016).

When Melendez arrived at the party, he was carrying a loaded gun and admittedly under the influence of drugs despite suffering from anxiety and paranoia. Melendez testified that as the party continued, he became scared and wanted to leave. He claimed the males, and even Keys possibly, were out to get him, allegedly threatening him with weapons Melendez described as "long shish kabob thing[s]." Melendez added that when Catalina approached him and allegedly reached for his gun, he thought she too may be part of the "conspiracy," and so he pointed the gun toward her and warned her to back up. Melendez testified he fired the gun because he wanted everyone to back away from him so he could leave. Thus, Melendez willingly pulled the trigger, opening fire inside the apartment. But Melendez did not stop with one warning shot, he fired nine more times for a total of ten shots toward the people in the apartment.

Catalina, to the contrary, testified that prior to being shot, she did not observe any altercations or disagreements between Melendez and anyone else. She stated that only she and Evelyn were in the living room close to where Melendez was standing, thereby discrediting Melendez's claim that anyone was coming toward him or that the males had any weapons. Catalina claimed Melendez's behavior caused her to approach him to ask if he was okay. In response, Melendez pointed the gun at her telling her to "back the f--- up." Before Catalina could turn around to seek shelter, Melendez opened fire fatally shooting Evelyn, seriously injuring Catalina, and shooting Daniel in the leg.

A reasonable person could determine that Melendez intentionally or knowingly opened fire in the apartment to get people to back away so he could leave, or that he knew that death or serious bodily harm was a likely result when he aimed the gun and fired ten bullets toward everyone in the small, enclosed apartment. *See Medina*, 7 S.W.3d at 637 (holding evidence was sufficient to find defendant had the intent to kill required for conviction of capital murder when defendant opened fire with an automatic assault rifle, at close range, into a crowd of teenagers and children at a party at the home of a rival gang member's girlfriend); *Motilla v. State*, 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) ("[T]he decision to fire more than once is further evidence of [appellant's] intent to kill.").

Immediately after the shooting, Melendez did not render aid to the victims or remain at the apartment; rather, he fled the scene and ran to a nearby apartment complex and attempted to dispose of the gun. "Evidence of flight is indicative of a consciousness of guilt[,] and it is a circumstance from which an inference of guilt may be drawn." *In re J.A.B.*, 440 S.W.3d 818, 823 (Tex. App.—El Paso 2013, no pet.) (citing *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim.

App. 2007)); *see also Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) ("Evidence of flight or escape is admissible as a circumstance from which an inference of guilt may be drawn.").

Based on the record before us, we conclude a rational factfinder could find that Melendez acted intentionally or knowingly when he opened fire, shooting and killing Evelyn, or that he knowingly pulled the trigger while knowing that death or serious bodily harm was a reasonably certain result when he aimed and fired ten bullets toward the people in the apartment. Therefore, the evidence is sufficient to support the jury's murder verdict beyond a reasonable doubt. *See Witcher*, 638 S.W.3d at 709–10; *see also Jackson*, 443 U.S. at 319.

Accordingly, we overrule Melendez's sufficiency issue.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Melendez also contends his counsel's performance fell below an objective standard of reasonableness for several reasons. As presented in his brief, Melendez argues his counsel failed to (1) request a limiting instruction and jury instruction regarding Melendez's other "bad acts" or extraneous offenses, specifically evidence he shot Catalina and Daniel in addition to Evelyn, (2) object to the State's alleged misstatement of law during closing argument, and (3) request a self-defense jury charge instruction.

### A. Standard of Review and Applicable Law to Ineffective Assistance of Counsel Claims

"To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate two things: deficient performance and prejudice." *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). A defendant must show that: (1) his trial counsel's representation fell below the objective standard of reasonableness, and (2) a reasonable probability exists that but for counsel's deficiency the result of the proceeding would have been different. *Strickland v. Washington*, 466

U.S. 668, 687–88, 694 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986) (applying *Strickland* to an ineffective assistance claim under the Texas Constitution).

"A [reviewing court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. "For an appellant to defeat this presumption, any allegation of ineffectiveness must be firmly founded in the record[,] and the record must affirmatively demonstrate the alleged ineffectiveness." *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) (internal quotation marks and alterations omitted). "Trial counsel should generally be given an opportunity to explain his actions before being found ineffective." *Id*. "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was so outrageous that no competent attorney would have engaged in it." *Id*. (internal quotation marks omitted). "A silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance." *Id*. "Thus, if the record does not contain affirmative evidence of trial counsel's reasoning or strategy, we presume counsel's performance was not deficient." *Id*.

A defendant bears the burden of proving both elements by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id*. A court need not address both elements of an ineffective assistance claim when the defendant makes an insufficient showing as to either element. *Strickland*, 466 U.S. at 697. When evaluating an ineffectiveness claim, courts consider the totality of the evidence. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010).

*B.      Analysis*

In his motion for new trial, Melendez did not contend he received ineffective assistance of counsel but instead argued that he should be granted a new trial because the verdict is contrary to the law and evidence. No hearing was held on Melendez's motion, and no affidavits were attached to his motion.

*1.  Limiting instruction and jury instruction on alleged "bad acts"*

Melendez contends he received ineffective assistance when his counsel failed to request a contemporaneous limiting instruction to evidence showing he shot Catalina and Daniel in addition to shooting Evelyn. Furthermore, Melendez argues he received ineffective assistance of counsel because his counsel did not request a jury instruction regarding the use of the extraneous offense or "bad acts" evidence.

Under Texas law, "[e]vidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others.'" *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (quoting *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)). "The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense." *Id.* "[S]ame-transaction contextual evidence is admissible only when the [charged] offense would make little or no sense without also bringing in [the same-transaction contextual] evidence[.]" *Id*.

The purpose of admitting same-transaction contextual evidence is to put the charged offense in context, that is, to illuminate the nature of the crime alleged. *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993). "[E]vents do not occur in a vacuum, and the jury has a

right to hear what occurred immediately prior to and subsequent to the commission of [the charged offense] so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). When such evidence is admitted, "Rule 404(b) is not implicated[,] and the defendant is not entitled to any limiting instruction concerning the use of that evidence." *Delgado v. State*, 235 S.W.3d 244, 253 & n.37 (Tex. Crim. App. 2007).

Here, the testimony about Melendez shooting Catalina, Daniel, and Evelyn was part of an "indivisible criminal transaction" when Melendez opened fire in the apartment. *See Devoe*, 354 S.W.3d at 469. This evidence put the charged offense in context by illuminating the nature of the crime alleged—that Evelyn was murdered when Melendez fired ten shots into an enclosed, small space, which also resulted in bullets hitting and injuring others. *See Camacho*, 864 S.W.2d at 532. The trial court could have reasonably concluded that this testimony constituted same-transaction contextual evidence. *See Delgado*, 235 S.W.3d at 253–54. Therefore, Melendez was not entitled to any limiting instruction on the use of that evidence. *See id*. We conclude the record does not rebut the strong presumption that Melendez's trial counsel fell below an objectively reasonable standard by failing to request a contemporaneous limiting instruction and a jury instruction regarding the extraneous offense or "bad acts" evidence.

### 2. Objection to the State's alleged misstatement of law in closing argument

Next, Melendez asserts that he received ineffective assistance when his trial counsel failed to object to an alleged misstatement of law during the State's closing argument. Specifically, Melendez's complaint focuses on one statement made by the prosecutor when explaining the culpable mental states necessary for the jury to convict Melendez of murder. The prosecutor stated, "Intent is when I point a gun at someone and pull the trigger, I intend to kill them." Melendez argues this statement resulted in the jury not having to deliberate over the circumstantial evidence

of Melendez's culpability in shooting Evelyn because, according to the State, merely pointing a gun at someone and pulling the trigger is murder.

The State, however, continued by stating, "That's intent, when it's your conscious desire or objective to cause the result. . . . Intent can be formed in an instant." The State then followed its discussion of what it means to act intentionally with an explanation of the culpable mental state of knowingly that also supports a murder conviction. The State described how the evidence showed Melendez acted either intentionally or knowingly.

In addition to discussing the second way in which the State could prove Melendez committed murder as alleged in the indictment and provided for in the jury charge, the State also explained various defenses and why they were inapplicable to this case. Finally, the State addressed the lesser-included offense of manslaughter and its associated mental culpability state, recklessness. The State provided examples of various recklessly committed offenses, distinguishing why Melendez's actions were not reckless.

The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable conclusion based solely on the evidence. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). "[P]roper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement." *Id*.

The statement Melendez claims was a misstatement of law is taken out of context from the State's entire closing argument wherein it discussed not only the culpable mental state of intentionally but also explained the culpable mental states of knowingly and even recklessly,

providing various examples of each. Based on our review of the record, we cannot conclude the State misstated the law.

Additionally, and in similar fashion as the State, Melendez's trial counsel also discussed the three culpable mental states during his closing argument but argued Melendez did not intentionally or knowingly shoot Evelyn as the State suggested. Ultimately, the correct law regarding the culpable mental states of intentionally or knowingly required to find Melendez guilty of committing murder—as well as the culpable mental state of recklessness for the lesser-included offense of manslaughter—were set forth in the jury charge. Immediately prior to the jury's deliberation, the trial court reminded the jury that in addition to the evidence, the jury also had the trial court's instructions and the law. Absent evidence to the contrary, we presume a jury follows the directions and law set forth by the trial court in the jury charge. *See Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996); *see also Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). Therefore, we conclude the record does not support Melendez's complaint that trial counsel rendered ineffective assistance when he did not object to the State's statement in closing argument.

### 3. Self-defense instruction

Last, Melendez argues his trial counsel provided ineffective assistance by failing to request a self-defense instruction in the jury charge based on Melendez's fear that others at the party were going to kill him. Melendez testified that before he opened fire in the apartment, he was scared and wanted to leave because Keys was possibly setting him up, the males in the kitchen were approaching him, and Catalina, who also was potentially part of the "conspiracy," attempted to grab his gun when she approached him. Catalina, however, testified she and Evelyn were the only people in the living room with Melendez and she was the only person who approached him to ask

him if he was okay. Melendez responded by pointing the gun at her and telling her to "back the f--- up." Also, Melendez agreed at trial he was not "coming to [the] jury and claiming self-defense[;]" rather, he was testifying to explain exactly what happened.

While Melendez admitted to firing the gun, he maintained that he did not intend to hurt anyone. And although the jury charge did not include a self-defense instruction, it did include the lesser-included offense of manslaughter, which provided the jury an alternative to hold Melendez accountable for shooting and killing Evelyn, but with the lesser culpable mental state of recklessness.

Generally, a defendant is entitled to a jury instruction when the issue is raised by the evidence. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A defense is supported or raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that [the] element is true." *Shaw v. State*, 243 S.W.3d 647, 657-58 (Tex. Crim. App. 2007). A person is justified in using force against another if he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a).

"Self-defense is a confession-and-avoidance defense requiring the defendant to admit to his otherwise illegal conduct." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010)). "He cannot both invoke self-defense and flatly deny the charged conduct." *Jordan*, 593 S.W.3d at 343 (citing *Juarez*, 308 S.W.3d at 406 (confession-and-avoidance requirements satisfied despite Juarez's inconsistent testimony alternatively admitting to the conduct and claiming it was an accident)). Thus, "a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense including the culpable mental state but interposes the

justification to excuse the otherwise criminal conduct." *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

A claim of self-defense must be supported by the record, and the defendant bears the initial burden of producing evidence supporting the submission of an issue on this defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

While the evidence contains Melendez's testimony that he was scared, Melendez specifically testified he was not claiming self-defense, thereby eliminating Melendez's ability to request the defensive instruction in the first place. Moreover, Melendez maintained that while he shot the gun several times, he did not mean to shoot anyone; thus, he denied intentionally or knowingly shooting anyone.

"[E]ven if [Melendez was] entitled to a defensive instruction, the decision to forgo such an instruction may not be objectively unreasonable, as these decisions are frequently grounded in trial strategy." *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023). "'[J]ust because a competent defense attorney recognizes that a particular defense *might* be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case.'" *Id*. (quoting *Vasquez v. State*, 830 S.W.2d 948, 950 n.3 (Tex. Crim. App. 1992) (emphasis in original)).

Other than Melendez testifying on direct examination that he was not claiming self-defense, the record is bare as to Melendez's trial counsel's strategy. On this record, counsel could have made a strategic decision not to request a self-defense instruction, especially considering Melendez maintains that he never intended to hurt anyone. To be entitled to the self-defense instruction, Melendez would have to acknowledge his culpability in committing the crime. This would run counter to the strategy at trial and on appeal. We conclude the record does not support

Melendez's claim that trial counsel's performance was deficient for failure to request a self-defense instruction.

Therefore, based on this record, we cannot conclude Melendez's complaints regarding counsel's performance amounted to ineffective assistance.

Accordingly, we overrule Melendez's ineffective assistance of counsel complaint.

### STATE'S CLOSING ARGUMENT

In his third and final issue, Melendez argues the State presented improper closing argument by (1) misstating the applicable law pertaining to the State's explanation of "intent" to convict Melendez of murder, and (2) improperly referencing "other bad acts" when including the other two victims of the shooting while calling on the jury to take action and find Melendez guilty.

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence." *Milton*, 572 S.W.3d at 239 (internal quotation marks omitted). "[P]roper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement." *Id*. "Generally, the bounds of proper closing argument are left to the sound discretion of the trial court." *Id*. at 240.

Melendez did not object to any portion of the State's closing argument. The Texas Court of Criminal Appeals has explained that the "right to a trial untainted by improper jury argument is forfeitable" and that "[e]ven an inflammatory jury argument is forfeited if the defendant does not pursue his objection to an adverse ruling." *Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018). The court concluded, "[e]rroneous jury argument must be preserved by

objection pursued to an adverse ruling; otherwise, any error from it is waived." *Id*. Melendez, therefore, waived his issues pertaining to the State's closing arguments.

Accordingly, we overrule Melendez's third issue.

## CONCLUSION

We affirm the trial court's final judgment of conviction.

Irene Rios, Justice

DO NOT PUBLISH